Certiorari Granted, June 2, 2010, No. 32,360

IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMCA-048

Filing Date: March 31, 2010

Docket No. 28,798

STATE OF NEW MEXICO,

     Plaintiff-Appellee,

v.

GARY FIGUEROA,

     Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY
Stephen Bridgforth, District Judge

Gary K. King, Attorney General
Santa Fe, NM
James W. Grayson, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**GARCIA, Judge.**

**{1}** Defendant entered a conditional plea to possession of cocaine, reserving the right to appeal the denial of his motion to suppress. We conclude that the drugs were obtained as a result of an illegal search and reverse. Once the officer dispelled his suspicions and told Defendant he was free to go, the officer was not justified in asking further questions about

1

drugs and weapons or in placing Defendant in a secure, spread-eagle position and patting him down. We also conclude that any consent given by Defendant was tainted by the prior illegality. Consequently, the drugs removed from Defendant's pocket should be suppressed.

**BACKGROUND**

**{2}**     Officer Mullins was the only witness at the hearing on the motion to suppress. He testified that on the date in question, at 6:59 p.m., a woman called stating that her brother had been harassing her. The police investigated but made no arrest. Later that evening, at 8:40 p.m., the police received a second call that the woman's brother had been harassing her, this time throwing her cell phone on the roof. Officer Mullins testified that he and his partner decided to park about fifty to seventy-five yards away from the home to observe in case there were any additional problems. While they were observing, the sister came outside and told them her brother again had been calling her and harassing her.

**{3}**     During the observation, a pick-up truck drove up and stopped in front of the house. It was facing the wrong way on the street. The driver remained in the truck with the engine running, while Defendant, the passenger, went inside the house. Officer Mullins decided to approach the truck to make sure they were not part of the "domestic problem," though he had seen Defendant at the house when responding to the first call and knew that the woman had been reporting problems with her brother, not with Defendant. Officer Mullins added that, based on his training and experience, having a driver pull up and leave the engine running, while a passenger went inside, looked like a drug transaction.

**{4}**     Officer Mullins talked to the driver, who said they had come to visit a friend. After one to two minutes, Defendant came out of the house. Officer Mullins approached him and asked why they were there. Defendant said he was checking on his friend. Officer Mullins asked for their identification, ran checks on the men, and found nothing. In his police report, Officer Mullins wrote that "[b]oth subjects were identified and after finding that there was no cause to keep them any further, they were given their information back and advised they could leave."

**{5}**     Officer Mullins testified that he gave Defendant his identification back because there was "no need to hold onto them any longer," and "then I asked him if he had anything illegal on him." At this point, Officer Mullins also asked him if he had any weapons. Defendant said no. Officer Mullins then asked if he could pat Defendant down; Defendant agreed. Officer Mullins admitted that Defendant was free to leave, but that he wanted to do a weapons check. He placed Defendant in a secure position, with both hands behind his back, fingers interlaced, and his feet spread apart. He checked Defendant's pocket and asked if he could remove what he felt. Defendant agreed. Officer Mullins removed cigarettes, change, and a bindle of drugs.

**{6}**     Defendant moved to suppress the evidence. He argued that (1) there was no reasonable suspicion to detain him; (2) the officer illegally expanded the scope of the stop; (3) once the stop was expanded, the officer was not justified in placing Defendant in a secure position and conducting a pat down search; and (4) any consent given was tainted. He

2

further argued that the stop was not a consensual encounter because he was not free to leave. He argued that the check for weapons was unjustified and he was illegally searched. The State argued that reasonable suspicion existed to question Defendant regarding his presence at the house and possible drug activity. It also argued that, even if there was no reasonable suspicion, once the officer told Defendant he was free to leave, the encounter became consensual. The State asserted that Defendant consented to the search.

**{7}**     The district court denied Defendant's motion to suppress. The court found: "Officer Mullins then asked [D]efendant if he could ask him a few more questions. Defendant agreed and consented to the pat-down and to the removal of the object in [D]efendant's pocket." Implicit in the court's ruling is the conclusion that after being told he was free to go, the encounter became consensual, and, therefore, Defendant's consent was valid.

**DISCUSSION**

**I.     Preservation**

**{8}**     Defendant argues that his consent was "an extension of the continuous illegal detention." The State contends that this issue was not preserved below. In the State's view, only one issue was preserved, and it was very narrow: whether Defendant's motion to suppress should have been granted because there was no reasonable suspicion to stop him at the outset. We disagree.

**{9}**     At the suppression hearing, the State argued that the encounter became consensual and that Defendant's consent was therefore validly given. In response, Defendant stated, "As far as consent breaking the chain, at no time was [Defendant] free to leave. In fact, Officer Mullins . . . expanded the stop after he gave him the ID back. Just by stating that he was free to leave does not make it so, especially when Officer Mullins place[d] him in a secure position . . . . He clearly was not free to leave."

**{10}**     As in many search and seizure cases, the proper analysis consists of multiple steps. In this case, the facts require consideration of whether there was reasonable suspicion to justify the detention, whether the encounter became consensual after the officer told Defendant he was free to go, whether the officer's expansion of the stop was legal, and whether Defendant's consent was valid. The issues concerning the legality of the questions immediately after Defendant was told he was free to go and whether the comment that he was free to go transformed the seizure into a consensual encounter are squarely presented by the facts and are logically linked.

**{11}**     Defendant specifically argued below that the officer illegally "expanded the stop" and that Defendant was not free to go no matter what the officer said. These contentions focus on the expansion of the investigation and can be reasonably viewed to include the legality of the questions about weapons and drugs. From Defendant's argument, one can legitimately conclude that his attack on this investigation included an attack on each link in the analysis, even if he did not primarily focus on the expansion during the suppression hearing. In addition, Defendant specifically argued that he remained illegally seized despite

the comment that he was free to go and that the encounter never became consensual.

**{12}** Defendant's challenge to every aspect of the investigation, from beginning to end, was sufficient to preserve the argument that the continued questioning was illegal and did not become consensual at any point. *See Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 540, 893 P.2d 428, 436 (1995) (stating that "[a]lthough [the] plaintiffs' due process arguments were not a model of clarity, and certainly could have been made with more specificity, they were sufficient to alert the [district] court and opposing counsel to the substance of the argument being made"). Defendant's arguments were sufficient to alert the court and opposing counsel to the problems with the expansion of the stop and to the State's argument that the encounter became consensual. *See State v. Granville*, 2006-NMCA-098, ¶ 16, 140 N.M. 345, 142 P.3d 933 (considering the issue to be preserved where the court was "armed with the legal assertions and facts necessary" to rule on the issue and the opposing party had the opportunity to respond).

**{13}** The purpose of the preservation requirement is to allow the court an opportunity to correct any mistake and to allow the opposing party a fair opportunity to respond. *See State v. Gomez*, 1997-NMSC-006, ¶ 29, 122 N.M. 777, 932 P.2d 1; *State v. Janzen*, 2007-NMCA-134, ¶ 11, 142 N.M. 638, 168 P.3d 768. The district court and the State had a fair opportunity to address the issue below. As we shall discuss herein, there is a significant line of authority dealing with the impermissible expansion of a stop, and that issue is presented by the facts in this case. We conclude that Defendant sufficiently preserved his attack on the legality of the continued questioning, the expansion of the seizure, and the validity of his consent.

**{14}** If the State is contending that Defendant's brief in chief does not raise these issues and, therefore, it was deprived of an opportunity to respond, we reject that contention as well. It is true that Defendant's brief argues, as Defendant did below, that Officer Mullins had no reasonable suspicion to even approach and begin his investigation. However, Defendant's brief also contends that the expansion of the stop was illegal. Defendant argues that his consent was tainted by an investigation that went beyond the scope of the original stop, citing *State v. Taylor*, 1999-NMCA-022, ¶ 20, 126 N.M. 569, 973 P.2d 246 (filed 1998), which specifically deals with an illegal expansion of a stop by questioning about weapons and drugs. Defendant argues that he "was never actually free to leave; therefore, consent was not voluntary, but an extension of the continuous illegal detention." Defendant's specific references are sufficient to identify the issues to be considered on appeal. We conclude that the issues were adequately preserved for review.

## II.     Suppression of Evidence

### A.     Standard of Review

**{15}** "Whether a search and seizure was constitutional is a mixed question of law and fact. We review factual determinations by the [district] court under a substantial evidence standard. We review the lower court's determination of legal questions de novo." *State v. Duran*, 2005-NMSC-034, ¶ 19, 138 N.M. 414, 120 P.3d 836 (citations omitted).

4

## B.    Reasonable Suspicion

**{16}**    Defendant first contends that the officer was without reasonable suspicion to initially approach him.  Defendant correctly points out that the woman's brother, not he, had been identified as the person causing problems.  Defendant also argues that a truck pulling up in front of a residence while the driver remained in the vehicle and the passenger went inside is insufficient to establish reasonable suspicion of drug trafficking.

**{17}**    "Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts." *State v. Flores*, 1996-NMCA-059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. "In determining whether reasonable suspicion exists, we examine the totality of the circumstances." *State v. Cardenas-Alvarez*, 2001-NMSC-017, ¶ 21, 130 N.M. 386, 25 P.3d 225.  "This is a fact-specific inquiry that does not lend itself to bright-line rules." *Duran*, 2005-NMSC-034, ¶ 23.

**{18}**    We agree with Defendant that the officer's suspicion of drug trafficking was not reasonable where there was no other evidence suggesting a drug transaction.  The police were observing a home for domestic violence issues; there was no evidence of any pattern of cars coming and going, staying only a brief period of time, or any other indication that drug trafficking was occurring at the house.  However, we disagree with Defendant that the police were without reasonable suspicion to investigate the domestic violence circumstances that brought them to the house.  Given that two reported incidents of domestic problems had occurred at the house in less than two hours, Officer Mullins was justified in making brief inquiries to find out what Defendant was doing at the woman's house.

## C.    Expansion of Stop

**{19}**    We next consider the officer's statement that Defendant was free to go, followed immediately by his questions about drugs and weapons.  The State casts these events in a benign light, arguing that once Defendant was allowed to leave, any further questioning, physical contact, or the request to conduct a search, were consensual.  By contrast, Defendant argues that the officer's questions were unjustified, tainted by illegality, and, therefore, his consent was invalid.

**{20}**    Initially, we must consider the factual findings made by the district court.  The district court found that "Officer Mullins then asked [D]efendant if he could ask him a few more questions."  This finding is not supported by the record.  The record reveals no request by Officer Mullins to ask additional questions.  The actual testimony is that immediately after returning Defendant's identification, Officer Mullins began his questioning about drugs and weapons.  Consequently, we reject the State's suggestions that Officer Mullins did nothing more than make a request and that Defendant "agreed to answer more questions."

**{21}**    We begin our analysis with the principle that "[a]n officer who makes a valid investigatory stop may briefly detain those he suspects of criminal activity to verify or quell that suspicion. The scope of activities during an investigatory detention must be reasonably related to the circumstances that initially justified the stop." *State v. Werner*, 117 N.M. 315,

5

317, 871 P.2d 971, 973 (1994) (citation omitted).

**{22}** All questions asked by police must be analyzed to see if they "are reasonably related to the initial justification for the stop or are supported by reasonable suspicion." *Duran*, 2005-NMSC-034, ¶ 35. This analysis must include an examination of "both the length of the detention and the manner in which it is carried out." *Id.* (internal quotation marks and citation omitted). The scope of the questioning should be limited, and the "particular facts of each stop and the intrusiveness of the questioning will dictate what questions are reasonable or unreasonable." *Id.* Follow-up questions must be reasonable. *Id.* ¶¶ 36, 41 (distinguishing between questions about travel plans, which are generally related to an initial stop, and questions about drugs or weapons). Questions about drugs or weapons "constitute a . . . distinct line of questioning . . . that require[s] a showing of reasonable suspicion of other criminal activity." *Id.* ¶ 41.

**{23}** "[C]ontinued investigation beyond the scope of the initial traffic stop is justified only if the officer can articulate specific and particularized factors that give rise to an objectively reasonable suspicion that other criminal activity has been or may be afoot." *State v. Prince*, 2004-NMCA-127, ¶ 9, 136 N.M. 521, 101 P.3d 332. "Reasonable suspicion is measured by the totality of the circumstances." *Id.* ¶ 10. However, if the officer failed to articulate specific facts to establish reasonable suspicion, then the officer had no grounds for additional questioning and detention. *In re Forfeiture of ($28,000.00)*, 1998-NMCA-029, ¶¶ 15-16, 124 N.M. 661, 954 P.2d 93 (filed 1997) ("If the initial suspicion is dispelled, the *Terry* stop comes to an end and the suspect is free to leave." (internal quotations marks and citation omitted)) (hereafter cited as *Forfeiture*). Moreover, if "the rationale for the stop has dissipated, a frisk is impermissible." *Id.* ¶ 15 (internal quotation marks and citation omitted).

**{24}** In *Forfeiture* the defendant was stopped to determine whether he had a valid license plate. *Id.* ¶ 11. Once it was determined that he did, it was impermissible for the officer to ask him whether he had weapons in the car, when nothing evolved during the stop that would justify that question. *Id.* ¶¶ 16-17. Accordingly, the subsequent search of the car was unlawful. *Id.* ¶ 17. The Court held "the investigation regarding weapons impermissibly exceeded the scope of the officer's rightful authority absent some particularized showing of illicit activity." *Id.* ¶ 18.

**{25}** As our cases indicate, the line is drawn between reasonable suspicion of other criminal activity and a mere hunch that renders continued questioning nothing more than a fishing expedition. *Compare Taylor*, 1999-NMCA-022, ¶¶ 18-23 (holding that where the defendant was the subject of a littering investigation, an officer's questions about guns and drugs impermissibly expanded the scope of the investigation because during the investigation nothing gave rise to any concern about guns or drugs), *with State v. Van Dang*, 2005-NMSC-033, ¶ 16, 138 N.M. 408, 120 P.3d 830 (holding that where the officer found that the defendant's name was not on the car rental contract, and explained why that, along with other conduct, raised a suspicion of drug activity, additional investigation regarding drugs was permissible). *Taylor* makes it clear that the police are not entitled to engage in a fishing expedition, and it holds that an expansion of the investigation must be based on particularized and objective suspicious indicators. 1999-NMCA-022, ¶¶ 22-23.

6

**{26}**     Having found no reason to investigate further and no reason to detain Defendant, Officer Mullins told Defendant he was free to leave. This constituted a recognition that his suspicion about Defendant's involvement in the domestic issue had been dispelled, and it ended his authority to detain Defendant or to investigate further. *See Forfeiture*, 1998-NMCA-029, ¶¶ 16-18. However, instead of letting Defendant leave, Officer Mullins successfully detained Defendant for a weapons check, even though there was no reasonable suspicion for his question about weapons and even though he articulated no danger to the officers.

**{27}**     His decision to continue questioning Defendant about weapons crossed the line into an impermissible fishing expedition and was not reasonable. Officer Mullins had already had contact with the woman who was complaining that her brother was harassing her, had knowledge that Defendant had not been identified in any way as being a part of the problem, and had received no report at any time that weapons had been a part of whatever was going on between the brother and sister. Drugs had not been mentioned by the sister, there was no reasonable suspicion that drugs played any part in the ongoing domestic issue, nor was there any other reasonable suspicion of drug activity. Consequently, we conclude that there was no evidence to support Officer Mullins' interest in weapons or drugs or to support his continued questioning of Defendant. For these reasons, we hold that Officer Mullins illegally expanded the scope of the initial investigatory stop.

### D.     Consensual Encounter

**{28}**     The State suggests that once Defendant was told he was free to leave everything that occurred thereafter became consensual. "A consensual encounter has been defined as simply the voluntary cooperation of a private citizen in response to a non-coercive questioning by a law enforcement official." *Ferris v. State*, 735 A.2d 491, 500 n.4 (Md. 1999). During a consensual encounter, a reasonable person feels that he or she is free to leave. *State v. Walters*, 1997-NMCA-013, ¶ 12, 123 N.M. 88, 934 P.2d 282 (filed 1996). If the encounter became consensual, then the Fourth Amendment is not implicated. *See Daniel v. State*, 597 S.E.2d 116, 120 (Ga. 2004), *abrogation in part on other grounds recognized by Salmeron v. State*, 632 S.E.2d 645, 647 (Ga. 2006); *State v. Jason L.*, 2000-NMSC-018, ¶ 14, 129 N.M. 119, 2 P.3d 856.

**{29}**     We consider "all of the circumstances surrounding the incident" to determine whether "a reasonable person would have believed that he [or she] was not free to leave." *Jason L.*, 2000-NMSC-018, ¶ 15 (alteration in original) (internal quotation marks and citation omitted). In making this determination, we consider "(1) the conduct of the police, (2) the person of the individual citizen, and (3) the physical surroundings of the encounter." *Id.* (internal quotation marks and citation omitted). We review the factual determinations for substantial evidence and the legal question of whether a reasonable person would have felt free to leave under the circumstances de novo. *Id.* ¶ 19.

**{30}**     In deciding whether an initial, valid detention has evolved into a consensual encounter, we observe that "[t]he transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred." *State v.*

*Williams*, 571 S.E.2d 703, 709 (S.C. Ct. App. 2002) (internal quotation marks and citation omitted). While an officer's statement that a suspect is free to go is a relevant consideration, it does not automatically make the encounter consensual thereafter. As stated in *Daniel*,

> [A]n officer's express statement that the motorist is free to leave does not by itself mean that the ensuing encounter is consensual. We recognize that even after a driver has been expressly advised that he or she is free to leave, an officer's subsequent actions may be so inconsistent with that advice that a reasonable person could conclude that the advice was no longer operative.

597 S.E.2d at 122.

**{31}** On these facts, we cannot conclude that the encounter became consensual. When the officer told Defendant he was free to leave, and then immediately continued his questioning, it would be a fiction to conclude that the nature of the seizure changed into a consensual encounter. *Reittinger v. Commonwealth*, 532 S.E.2d 25, 26-28 (Va. 2000) (holding that where the officer told the defendant he was free to go and immediately thereafter asked questions about weapons and drugs and asked for permission to search, the comment that the defendant was free to go did not make the encounter consensual because what "transpired immediately thereafter would suggest to a reasonable person that just the opposite was the case"); *Commonwealth v. Freeman*, 757 A.2d 903, 907-08 (Pa. 2000) (holding that after the officer told the driver she was free to leave and walked back to his patrol car but then returned to her car and questioned her, the remark that she was free to leave did not make the renewed encounter consensual). We agree with Professor LaFave that "it is hard to swallow . . . that returning one's credentials with a citation or warning ticket sufficiently manifests a change in status when immediately followed by interrogation." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3(g) (4th ed. 2004). We think the reality is that even if a person is told he or she is free to leave, most people will not feel free to walk away when continued police questioning seamlessly follows. *See State v. Garcia*, 123 S.W.3d 335, 347 (Tenn. 2003) (stating that "a citizen who has been subjected to a traffic stop is not likely to walk away from continued police questioning, despite being told that he or she is free to leave").

**{32}** When faced with the question whether an initial seizure has changed into a consensual encounter, we require a showing that the nature of the encounter has truly changed. In this case, there was no break in time or location, no request for permission to continue with questioning, and nothing indicating that the seizure had changed to anything remotely consensual. We conclude that the comment that Defendant was free to go did not transform the encounter into a consensual one. *See id.*; *see also Freeman*, 757 A.2d at 907-08; *Reittinger*, 532 S.E.2d at 26-28. Consequently, we reject the State's argument in this case.

**{33}** We emphasize that our conclusion on this issue is highly fact dependent, and our holding is limited to the facts in our case. A different result may occur where an officer is

8

careful to clearly establish a transformation in the encounter. *See, e.g.*, *United States v. Esquivel*, 507 F.3d 1154, 1157, 1159 (8th Cir. 2007) (noting that the officer asked permission to ask further questions prior to consensual encounter); *Jason L.*, 2000-NMSC-018, ¶ 18 (noting that an explanation that the person could refuse to answer the officer's questions is relevant in determining whether the encounter was consensual); *Marinaro v. State*, 163 P.3d 833, 836 (Wyo. 2007) (characterizing the subsequent encounter as a "non-demanding, relatively cordial request by the trooper to ask more questions" when after telling the defendant he was free to go, the officer re-approached him and asked permission to ask more questions). No single factor is dispositive and all of the circumstances surrounding the incident must be considered. *Jason L.*, 2000-NMSC-018, ¶ 15.

### E.      Consent

**{34}**    We next address whether Defendant's consent would provide justification for admission of the evidence. An illegal stop taints any subsequent consent to search. *See Taylor*, 1999-NMCA-022, ¶¶ 26-30. The burden is then on the prosecution to prove that there are "intervening factors which prove that the consent was sufficiently attenuated from the illegal stop." *State v. Bedolla*, 111 N.M. 448, 456, 806 P.2d 588, 596 (Ct. App. 1991); *see Taylor*, 1999-NMCA-022, ¶ 27 (stating that consent must be "both voluntary and purged of all taint under a Fourth Amendment challenge"). "To determine whether the evidence discovered by the officers' search should have been suppressed under the 'fruit of the poisonous tree' doctrine, we determine whether the officers obtained [the d]efendant's consent by means sufficiently distinguishable to be purged of the primary taint." *State v. Monteleone*, 2005-NMCA-129, ¶ 17, 138 N.M. 544, 123 P.3d 777 (internal quotation marks and citation omitted). "If there is sufficient attenuation between the illegality and the consent to search, the evidence is admissible." *Id.* "To determine whether there was sufficient attenuation, we consider the temporal proximity of the arrest and the consent, the presence of intervening circumstances, and the flagrancy of the official misconduct." *Id.* (internal quotation marks and citation omitted). We review the district court's determination that sufficient attenuation exists de novo. *Id.*

**{35}**    Officer Mullins' questioning of Defendant about weapons and drugs occurred immediately after Defendant was told that he was free to go, and there were no intervening circumstances. The officer did not request permission to ask Defendant a few more questions. Instead, he immediately asked Defendant whether he had anything illegal or weapons. The request to pat Defendant down followed immediately on the heels of Officer Mullins' improper questions. Our previous cases dictate that such a consent is tainted, especially where there is no meaningful break in time, the officer has not asked for permission to ask more questions, and the officer has not explained that the defendant is under no obligation to answer additional questions. *See State v. Rivas*, 2007-NMCA-020, ¶¶ 16-18, 141 N.M. 87, 150 P.3d 1037 (filed 2006) (holding that consent was not attenuated from the illegal detention where the officer sought consent almost immediately and there was no time for intervening circumstances to break the causal chain); *Prince*, 2004-NMCA-127, ¶¶ 20-21 (holding that the defendant's consent was tainted where there "was no break in the

9

causal chain, either in terms of temporal proximity or intervening circumstances"); *Taylor*, 1999-NMCA-022, ¶¶ 26-29 (holding that there was no attenuation where the officer "asked the improper questions immediately before asking for consent to search, and no other events occurred to separate the consent and the questions"). We conclude that Defendant's consent was not sufficiently attenuated from the prior illegality. As in *Taylor*, "the very purpose of seeking consent was to continue an investigation that was beyond the scope of the officer's reasonable suspicion." 1999-NMCA-022, ¶ 29. The State, therefore, may not rely on Defendant's consent.

**CONCLUSION**

**{36}** For these reasons, we reverse the district court and hold that the illegal expansion of the investigation requires suppression of the evidence seized by Officer Mullins.

**{37}** **IT IS SO ORDERED.**

                                               _____

                                               **TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____

**CYNTHIA A. FRY, Chief Judge**

_____

**RODERICK T. KENNEDY, Judge**

**Topic Index for *State v. Figueroa*, Docket No. 28,798**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| AE-PA | Preservation of Issues for Appeal |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |
| CT-SU | Suppression of Evidence |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CN | Consent |
| CA-DN | Detention or Custody |
| CA-MR | Motion to Suppress |
| CA-RS | Reasonable Suspicion |
| CA-SZ | Search and Seizure |